### William R. White et al. v. Thomas Moran.

1. DECEIT—who may be held for. Those who have actual or
constructive knowledge of the fraudulent character of an enterprise
and with such knowledge aid and abet its furtherance, and by
means of false and untrue representations induce a person to in-
vest therein, are jointly and equally liable with the principal in
the enterprise likewise charged with fraud and deceit in inducing
the investment in question.

2. ARGUMENTS OF COUNSEL—propriety in limits of. While coun-
sel have the right fully and freely to discuss the evidence in a
case, and to draw and express all reasonable and legitimate in-
ferences therefrom, great care should be exercised to refrain from
indulging in excessive invective and epithets, and to keep within
the record.

Action in case for fraud and deceit. Appeal from the Circuit
Court of Logan county; the Hon. COLOSTIN D. MYERS, Judge, pre-
siding. Heard in this court at the November term, 1905. Re-
versed and remanded. Opinion filed December 21, 1906.

BLINN & COVEY, HUMPHREY & ANDERSON and WELTY,
STERLING & WHITMORE, for appellants.

BEACH, HODNETT & TRAPP, KING & MILLER and BALD-
WIN & STRINGER, for appellee. ·

MR. JUSTICE PUTERBAUGH delivered the opinion of
the court.

This is an action in case, by appellee against appel-
lants, for alleged fraud and deceit. The plaintiff re-
covered judgment for $1,659.25, to reverse which this
appeal is prosecuted by the defendants. At the close
of the plaintiff's case, and again at the close of all
the evidence, the defendants severally moved·the court

to direct verdicts in their favor; which motions were overruled.

The first count of the declaration charges in substance that on November 21, 1903, and prior thereto, the defendant, White, claimed to be the patentee and owner of certain patents covering swinging farm gates; that the defendants, with the intent to defraud the plaintiff, represented to him by means of certain printed circulars and copies of pretended letters and excerpts from newspapers and by oral statements, that the gates manufactured under said patents were very valuable; that there was a large demand for them and they were selling rapidly; that divers persons had made large sums of money in a very short time in selling the same; that various customers of the said White had purchased territory and territorial rights to said patents under the contract thereinafter set forth, and had in a very short space of time made vast sums of money in selling the same; that plaintiff could do likewise by purchasing the territory described as the county of Ashland in the state of Ohio; that the plan of operation prescribed by said contract was the best and most wonderful money-making scheme ever known; that all the notes taken in the sale of territory remained in the hands of said White until maturity and were not assigned or placed in the bank. It is then further averred that all of the foregoing representations of said defendants were false and untrue and known by them and each of them to be so; that they were made for the purpose of inducing the plaintiff to rely thereon and to defraud him, and that the plaintiff, relying upon and confiding in said false representations, was deceived thereby and induced to enter into a contract with the defendant White for the purchase of the patent right to the county of Ashland in the state of Ohio, and of a so-called United States agency for the sale of territory. The material portions of the contract, which is set out in full in said count, are as follows:

"THE VALUABLE UNITED STATES AGENCY.

I hereby agree to give to Thomas Moran, of Lincoln, one-half of all townships, counties, and gate rights of unsold territory that he may sell on my new gates and designs, as now handled by me, he paying his expenses, sending in my part as soon as practicable, but keeping all he gets in the territory purchased of me.

Arrangements have been made for those who take one county at $500, and an agency of $1,000, or two counties and an agency for $2,000, to permit such purchaser to sell townships in many counties where they have been sold in lots of two or more, keeping one half, sending money to patentee who will forward it to the owner. Prices ranging from $125 to $175 per township.

2. If men are sent who cannot arrange to pay $500, $1,500 or $3,000 and upward, the sender will be charged with car fare. * * * It will be expected of each customer to pay one-third to one-half cash, and surely if notes are given they must be good and safe notes beyond question.

3. If a county has to be bought which has been sold to fit up a new customer, the party sending such customer will remember that the price for the county must be subtracted from the amount given by the new customer; then we divide equal on what is paid above the cost of said county. You can get your own notes or money back on the first trade or two if the pay from your first customer is as good or better than your own. After that you get the same kind of pay I get.

4. I further agree to give him one-half of all the sales of unsold territory that I make to men he puts me in communication with, or sends to me, we paying one-half car fare to such men. He is to send responsible men who will come in good faith, who will stay long enough to make a fair investigation—not less than one day.

5. After selling your own territory, (or before) you may go to other choice unsold territory and sell on above terms without purchasing more, and you have

the right to correspond with other parties outside of your territory, and you can send and talk to men in territory that is sold, and when they come they can buy other territory, and they in turn can sell or send to me their neighbors and friends who will buy other territory. You are to use energy to further this enterprise, being fair with all concerned. If I, or my agents, or any customer, have pending sales with a man, you are not to sell to such man, expecting a per cent., but encourage such customers, and others will do likewise for you. Each are to find new men, not taking another's sale.

6. I will assist my customers to make sales with office help giving them one-half on the above terms, the lifetime of the patent (17 years from June 12, 1900), or as long as fairness is done  *  *  *.

W. R. WHITE,<br>
Seventy times patentee.''

That the defendant White then executed to the plaintiff a so-called deed to the territory purchased by him in the words and figures following, to wit:

"To WHOM IT MAY CONCERN:—

Be it known that I, the undersigned, have sold to Thomas Moran the right to use and sell my invention for the farm and stock raiser, in and for the county of Ashland, in the state of Ohio, also my United States agency for all unsold states, and as this invention attracts the farmers' and speculators' attention, he will be apt to find buyers for unsold territory.

Now if the said Thomas Moran will bring or send such traders to me, or through his assistance, a sale is effected, by operating his gate in his own territory, and passing deeds that I have signed, I hereby agree to permit him to sell counties as cheap as if I were present, subject to my approval for which I will do favors of sending him circulars, etc. This is to be good for seventeen years from June 12, 1900, or as long as fairness is done. Selling good counties at $500 each, but reports must be made every fifteen days.

A strict account of all farm rights, township rights, notes, money and property, shall be given by said

Thomas Moran and reported to patentee, but he is not to interfere in said White's sales by selling or trying to sell, to parties with whom White or his agents have pending sales, which is a violation, and in such case, this agency would be called in and the holder might be held for damages.

The holder is to do all he can to further the interests of the enterprise, but in the bounds of fairness to all concerned. This agency is not to be used in McLean county, Illinois, or to parties in said county, but only to parties becoming interested at this agent's exhibits while in his county or on the train. He also has the right to correspond with parties interested in his exhibit.

WILLIAM R. WHITE,<br>Patentee.''

Said count further avers that the defendant, White, also executed and delivered to the plaintiff a pretended deed to certain patents therein described, and that by reason of said false representations, and in reliance thereon, the plaintiff, in consideration of the delivery to him of the so-called deeds and said contract, executed and delivered to the defendant, White, his two promissory notes for the sum of $750 each, dated November 21, 1903, payable to the order of W. R. White, and due in four and six months after date, respectively; that said White assigned said notes to the People's Bank of Bloomington, and that the defendants received the proceeds thereof; that prior to the commencement of this suit, the plaintiff demanded the return of said notes from the defendants, and tendered to them the contract and certificates of sale issued to him by said White, but they refused to surrender the same. The count concludes with specific averments that each and every representation therein alleged to have been made was false and untrue, and that by reason of the premises the plaintiff was defrauded, etc. The second count, which is similar to the first, charges fraud and deceit in substantially the same language, and also that the defend-

ants, Hawes and Boruff, were agents and partners of White; that the promissory notes in question were assigned before maturity for a valuable consideration and without recourse; that it was the understanding between them that White was to receive one-half of the proceeds and Hawes and Boruff the remainder; that plaintiff had surrendered the contract and deeds prior to the commencement of the suit; and that the plaintiff had expended $40 in efforts to sell territory under said contract. To the declaration, the defendants pleaded the general issue.

The facts involved appear from the record to be substantially as follows: Appellant, White, was the patentee and owner of several patents on an improved farm-gate, under which he sold territorial rights and appointed agents under contracts similar to that set out in the declaration. Appellants, Hawes and Boruff, were real estate agents in the city of Atlanta, and had, prior to November 21, 1903, purchased a county and agency from White under a contract of the character mentioned. Pursuant thereto they had furnished the name of appellee, Moran, as a probable purchaser of territory and an agency. White thereupon sent to Moran, by mail, a number of circulars, and copies of purported letters of recommendation, among which were the following:

### EXHIBIT Q.

"DEAR SIR:—I can give some reliable parties who can secure $500 to $3000, a paying business, choice locality of unsold territory. I have an article, or machine, valuable to all farmers and stockraisers. With the help of three farmers I made over $65,000 clear in about seven months. Sales in one county were $12,360. The like never known before. I give best bank references, fairness to all. * * *.

I went 85 miles from home to see what could be made out of a single county, selling the machines and townships, and in about seven months I sold $12,360 in one county. Other men have sold several hundred dol-

lars worth in a single township. All this I will prove to any one who is interested enough to come to my office. My terms are as follows:—To a man who buys territory I sell the machine at net factory cost and give him the right to make them if he desires. All the proceeds from his territory are his alone, and I have no share in them. And in addition I allow my customers who make a sufficient investment $1500 or more, a commission of 50 per cent. on all unsold territory which they sell, or in case I make a territory sale through my offices, to a party whom one of my customers has interested in the business, I will allow the commission the same as though the sale was made direct by the customer. * * *.

Respectfully yours,

WM. R. WHITE,

Seventy times patentee."

EXHIBIT C.

"EARNINGS OF W. R. WHITE'S CUSTOMERS.

Jones & Pritchard, Beaver Dam, Wis. $35,500 in 7 mo. H. A. Knapp, Evansville, Wis., $6,250 in 4 mo. Otto Messenbring, Cologne, Minn., $2,250 in 3 mo. E. W. Requa, Beaver Dam, Wis., $1,250 in 50 days. O. F. Weisenborn, Hancock Co., Ill., $2,600 in 60 da. George Hanson, Monticello, Ill., $5,500, in 5 mo. A. C. Ament, Ursa, Ill., $4,500 in 3 mo. Two ladies in Bloomington, Ill., $4,500 in 3 mo. T. E. Gregg, Wabash, Ind., $2,250 in 8 wks. J. S. Dumbald, Quincy, Ill., $3,500 in 8 wks. Enos Lloyd Jones, Hillside, Wis., $2,625 in 4 mo. C. R. Gilham, Loraine, Ill., $1,000 in 2 da. C. A. Emery, Carthage, Mo., $2,000 in 40 da. C. W. Vandewalker, Wapaco, Wis., $4,250 in 3 mo. B. Hauser, Milwaukee, $1,125 in one mo. T. J. Howser, Atlanta, Ill., $4,900 in 2 mo. *Miss Elizabeth Nees, Springfield, Ill., $2,250 in 3 wks.* J. B. DeFox, Quincy, Ill., $1,250 in 4 da. R. W. Hughes, Oskaloosa, Ia., $4,750 in 3 mo. *H. C. Hawes, Atlanta, Ill., $2,750 in 2 wks.* Frank S. Horner, Rockford, Ill., $2,250 in 3 wks. Miss Christy, Bloomington, Ill., $1,750 in 30 da. *A. C. Colean, Springfield, $750 in 5 da.*. H. B. Wait, Pringbor, Ia., $2,500 in 6 wks. F. W. Hahn, Shemington, Wis., $5,250 in 6 wks."

## EXHIBIT P.

### "SEPTEMBER RECORD BREAKER.

### ONE HUNDRED THOUSAND DOLLARS ($100,000).

Wonderful range of business on the W. R. White invention.

When Mr. White did $50,000 worth of business in July, it was thought that high-water mark had been reached, but August showed a greater business, running to $62,000, and this was thought to be about the limit, but the month of September shows that this great business is still growing and the sales for that month reached the magnificent amount of $100,000.

Of this month's work the following men and women have earned commissions as follows;—R. W. Hughes, $2,500; J. D. Fry, $1,500; B. Polling, $1,500; T. J. McAdams, $1,500; C. R. Gilham, $1,000; C. W. Vandewalker, $3,750; O. F. Weisenborn, $1,500; A Bloomington Lady, $3,285; J. S. Dumball, $1,000; Jones and Pritchard, $7,000; L. E. Sargent, $2,000; D. F. Ward, $1,500; C. L. Jones, $1,500; Phebe Swan, $500; Effie Vandeliner, $750; Miss Sales, $750; F. W. Hahn, $1,500; Another Bloomington Lady, $750."

The testimony of Moran is, in substance, that shortly after he received the circulars, etc., above mentioned, he went to Bloomington in response thereto; that he had a conversation with White at his office; that White explained his plan, and said that everybody who came there invested and made money; and showed him a wallet stating that it contained something like $200,000 in notes, and several bank-books which indicated large deposits to his credit stating that they were the proceeds of the sales of territory; that he further stated that there was not very much money in selling gates, that the business was to sell territory as there was the most money in doing so; that if witness wanted to make anything he would have either to sell agencies or send some one to him who would buy; that all the witness would have to do was to send in the names of responsible persons and that he would do the rest; that in case witness failed he would make him no trouble, and ad-

vised him to invest while there and make money as all
others who had invested had done. Moran further testi-
fied that while he was at White's office, and afterward
at White's residence where he was invited to dine, he
met a number of persons, all of whom were discussing
the great value of territory and the large sums that
had been made by those who had beer fortunate enough
to buy the same from White; that in White's office
there was a bulletin board purporting to give the
names of persons who had made large sums of money
selling territory; that upon his return home to Lincoln
on the following day, he learned that appellant Boruff,
whom he had never met, was in the city and desired
to see him and that he called upon him; that Boruff
stated to witness that he understood that he had been
at Bloomington the day before, and asked him what
he thought about the investment; that witness replied
that he thought pretty well of it, whereupon Boruff
stated that White was a man of his word and that
everything he said was true; that witness then asked
him "What if a man could not make it?" to which
Boruff replied that he had known White on some oc-
casions to return the money to people who were not
able to make anything, and that witness' note would
be all right if he invested; that Boruff then produced
the contract in question and inserted therein the words
"Ashland county, Ohio," as descriptive of the territory
conveyed, after which witness executed the same.
Moran further testified that he thereafter made efforts
to interest various persons and induce them to invest,
but without success, and that he finally became con-
vinced that the enterprise was a fraud, demanded the
return of his notes, and on June 1, 1904, brought this
suit.

An examination of the evidence contained in the
unusually voluminous record, in connection with the
contract, discloses, beyond question, that the large
sums of money represented by White, through his cir-
culars and personal interviews, to have been earned

by former purchasers, were not realized through the manufacture or sale by them of the farm gates covered by the patents. A number of said purchasers testified that after they had invested, White stated to them, that it was not necessary that they should sell the gates but that all they had to do to make money was to solicit and induce their friends and others to enter into like contracts. It is also apparent that the rights to sell territory conveyed, were not intended by White to be exercised or utilized in the ordinary and legitimate way, but it was his purpose and desire that purchasers should limit their efforts to "drumming up" fresh customers for agencies and territory, by prevailing upon their relatives, acquaintances and friends to call at his office, in order that he and his assistants might, by taking advantage of their ignorance, credulity, cupidity, or taste for speculative ventures, induce them to invest in the so-called enterprise, and in their turn introduce and interest still others, and so on *ad infinitum*. The transaction here involved was therefore but a link in an endless chain, the length of which was determinable only by the number of future investors it was possible to secure from time to time. It is manifest it was inevitable that when the supply of dupes became exhausted, those who had been unable to unload their losses upon others would suffer.

This view of the enterprise is corroborated and well illustrated by the experience of Miss Elizabeth Nees, a school mistress residing in Springfield, Illinois, who purchased territory under one of the contracts in question. Her testimony shows that she became interested in the project through one Dumbald, who was working under a similar contract, and purchased Clay county, Indiana, giving therefor two notes for $750 each, one of which was turned over to Dumbald under his contract, and the other retained by White. After purchasing she was informed by White that she would not have to sell gates but was expected to sell territory only; that in order to interest prospective purchasers

she was to state the case to them as it had been stated to her; to tell them that it was an investment of $1,500 for which sum they would have to give their notes, and that if such persons afterward purchased she would receive one-half of the amount paid by them. She took two persons, Parks and Stickle, to Bloomington, both of whom invested. One of her notes for $750 was thereupon returned to her together with one given by Stickle for a like sum. The evidence further discloses that one Fox who held a contract, induced one Shepherd to invest; that Shepherd in turn interested A. C. Colean and one Wright. That A. C. Colean interested J. H. Colean, and one Kincaid, and that Kincaid interested one Small and that all of them purchased territory. Colean was then given one each of the notes given by Shepherd and Kincaid. J. D. Fry upon investing gave three notes for $500 each. He interested Davidson and Miller and received two of his own notes and was credited with $250 upon one of the others.

The method in which holders of contracts received their compensation is thus described by counsel for appellant in their argument in this court:

"If an agent took a customer to White whose note was as good as the agent's note White would take two notes from the customer each for $750 and would give to the agent one of his own notes. When the agent brought the second customer who gave notes as good as the agent's own note, then the agent got his second note. If the customer in White's opinion was not as responsible financially as the agent, then White kept the agent's note and gave to the agent one of the notes of the agent's own customer. After the agent had taken up both his notes, then he received as his pay one of the notes of his own customer whom he brought to White."

The enterprise thus conducted by White was clearly illegitimate and contrary to public policy, if not fraudulent, and merits the strongest condemnation. It may

properly be classed with the numerous so-called ''get rich quick'' schemes with which the country is now unfortunately infested, and to which many ignorant but deserving citizens, many of them women, fall ready victims.

Appellee's right of recovery is not, however, predicated upon the illegality of the consideration for the notes given by him, but upon the alleged fraudulent and deceitful representations averred in the declaration. That White realized large sums of money in the furtherance of the scheme is obvious from its character and the evidence. It was also undoubtedly exceedingly profitable to those of his customers and confederates as were able to pursuade any considerable number of persons to invest.

Among the misrepresentations averred by the declaration were those contained in the circulars above quoted, to the effect that Miss Elizabeth Nees had earned in commissions $2,250 in three weeks; A. C. Colean, $750 in five days; and J. D. Fry, $1,500 in one month. These representations were material, they related to a past alleged fact or event. There is evidence to show that they were untrue; that they were known to White to be untrue when he made them; that they were made with the intent to deceive; that appellee was deceived thereby and acted upon them. If the jury believed these propositions were proved by the greater weight of evidence a right of action was established as against appellant, White. There are also facts and circumstances appearing in evidence which tend to show that appellants Boruff and Hawes who held an agency jointly, suggested the name of appellee to White as a possible customer; that Boruff went to Lincoln with the contract and by his representations to appellee aided in inducing him to execute the same; and, further, that he and Hawes jointly received, and claimed upon the trial to own, one of appellee's notes as their commissions upon the transaction.

If they had actual or constructive knowledge of the

fraudulent character of the enterprise, and with such knowledge, aided and abetted in its furtherance, and by means of false and untrue representations induced appellee to invest therein, they were *in pari delicto* with White in the fraud and deceit practiced and equally liable with him for any damages occasioned to appellee. Allin v. Millison, 72 Ill. 201. As the present judgment must be reversed we shall not discuss the weight of the evidence upon the question.

It will suffice to say that the court did not err in refusing to direct verdicts in favor of the defendants or either of them.

While appellee was testifying in his own behalf, counsel for appellants sought to show by him upon cross-examination, that he had no property out of which a judgment for the amount due upon the notes, if one were obtained, could be made by execution, but the court held that such evidence was incompetent under the issues and refused to admit the same. The suit at bar was instituted for the recovery of damages alleged to have been sustained by appellee by reason of his having been deceived and defrauded, whereby he gave the notes described in the declaration. He admitted that he had never paid the same or any part thereof. Substantially the only damages he claimed or was shown to have sustained, were such as would be occasioned by his being compelled to pay the notes. It is obvious that if the notes were valueless by reason of his inability to pay the same, appellee could not have been damaged to the extent of their face value.

The evidence offered was therefore competent in mitigation of damages, and the court erred in refusing to admit the same. Thayer v. Manley, 73 N. Y. 305; M. E. R. Co. v. Kneeland, 120 N. Y. 134; Lyle v. McCormick, 108 Wis. 82. Such error was clearly prejudicial.

Complaint is made of other rulings of the court. In a number of instances, for the purpose of showing that the agencies and territorial rights were not valuable

as represented by appellant White prior to the time of the purchase by appellee, witnesses for appellee were permitted to testify as to alleged misrepresentations made by White to them and as to losses incurred by them after the making of said misrepresentations to appellee. This was error. To entitle appellee to recover under his declaration, it was necessary for him to establish that fraud and deceit were practiced upon him prior to the time he executed the contract and notes in question, and also that appellants then knew that the statements made by them were untrue. While evidence as to the transaction between White and parties other than Moran prior to the execution of the notes and contract here involved was competent (Allin v. Millison, *supra*), this is not so as to the subsequent transactions. The evidence of purchasers of territory under patents other than those in which rights were sold to appellee was also incompetent.

The first instruction given for appellee was faulty in that, while purporting to enumerate the prerequisite facts to warrant a recovery, the essential elements that the representation must have been material and have related to present or past transactions, were omitted. The instruction authorizes a recovery if any statement was shown to be untrue without regard to its materiality or whether it related to then present, past or future events. The other criticisms of this instruction were not warranted. There was, we think, sufficient evidence upon which to base appellee's second instruction. Appellants' first refused instruction was properly refused. While some of the comments of counsel for appellee in his closing argument, of which complaint is made, were not wholly unjustifiable, other portions of the same were not based upon the evidence, and were so unduly severe and intemperate as to tend unduly to arouse the passion and prejudice of the jury. In fact the limit of propriety was reached. While counsel have the right fully and freely to discuss the evidence in a case and to draw and express all reason-

494 APPELLATE COURTS OF ILLINOIS.

VOL. 134.] Central Illinois Const. Co. v. Lloyd.

able and legitimate inferences therefrom, great care should be exercised to refrain from indulging in excessive invective and epithets, and to keep within the record. Verdicts are frequently endangered by the opposite course.

Because of the errors indicated, the judgment must be reversed and the cause remanded for another trial.

*Reversed and remanded.*